MYERS v. HAM.

1. Slaves married before emancipation according to the custom among planta-
   tion negroes, and living together as man and wife in 1865, were declared by
   the act of that year (13 *Stat.* 269) to be lawfully married ; and their chil-
   dren are legitimate.
2. Where a child of such parents lives with his father, the father is the head
   of a family within the meaning of the homestead laws.
3. A judgment debtor's land was sold by the sheriff, without objection or claim
   of homestead by the debtor, and was purchased by the judgment creditor.
   *Held,* that such debtor was not estopped from afterwards claiming a home-
   stead in this land.

4. A debtor cannot maintain an action in the Circuit Court to have a homestead assigned to him. He must follow the statutory proceedings, which are exclusive.

MR. JUSTICE McGOWAN, concurred in the result.

---

Before ALDRICH, J., Georgetown, March, 1883.

. This was an action by Roanoke Myers against P. A. Ham, commenced January 20th, 1883. The case is fully stated in the Circuit decree, which was as follows :

The plaintiff, Roanoke, claims that he is the head of a family and entitled to a homestead in a tract of land on Sampit, which was sold by the sheriff, at Georgetown, to satisfy an execution lodged in his office November 7th, 1881, on a judgment in favor of the defendant, Ham, who became the purchaser of the land now claimed as a homestead. The right of action, it is admitted, arose subsequent to the adoption of the constitution of 1868. He prays that the defendant be required to restore the land, to be set off as his homestead, that he pay damages, and that he be restrained from committing waste. The defendant admits that he was the purchaser, but denies that Roanoke was a married man and the head of a family ; that the land was levied upon and advertised for sale, that he set up no claim for a homestead, and even if he had been a married man and the head of a family, that he is not now entitled to a homestead.

C. Wilson, J. Davis, S. Smith, and F. Vanderhorst, all negroes, testify that Roanoke and Delia lived together as husband and wife in one house, and were so regarded. Roanoke says he and Delia were man and wife ; that they were married according to plantation law, that is, they went to their master, the Rev. Mr. Lance, for a house, and he would not let them have it unless as man and wife. That was the law of the plantation. That he took her for his wife and had four children by her. Cupid is the youngest. He has been living with him " ever since he. was big enough to run arter me." He says he had Delia a year before freedom, and that she has not lived with him for ten years.

J. Z. McConnell, a white man, says he has known Roanoke twelve or fourteen years; that he was always regarded in the neighborhood as a single man. S. Knight, a mulatto, says Roanoke was regarded as a single man, unmarried; that he heard him tell Delia, in his yard, last February, "Delia, I never married you, and you ain't my wife." The defendant says Roanoke was regarded as a single man, and has lately married another woman. He says, after he bought at sheriff's sale, Roanoke was put out of possession by the trial justice; that he then became his tenant. His rent was the forage made. Defendant was working the trees for turpentine and wanted forage for his stock; Roanoke never said anything about a homestead at the sheriff's sale or since he bought the land. Sheriff Doar, and his deputy, Ward, say Roanoke has been here frequently, before and after the sale, and never said anything about a homestead.

Delia says: "My name is Delia Knight; I did not live with Roanoke as his wife—was never married to him;" that she lived with him two weeks before emancipation, when he threw her things out of the house; that after she went back to him, at the persuasion of her mother, and lived with him a week; then went to stay with him at "Harmony, and was back and forwards; staid with him in Georgetown, but he was not my husband, for I could not live with him; he beat me; then he lived with me in Georgetown three years; he beat me so I could not live with him; I paid the house-rent by washing; I had a child by Woodward, a white soldier; Cupid is the child of Roanoke."

This is, I think, a full statement of the facts. The first question is: Were Roanoke and Delia husband and wife? It is very evident they were not married according to the rites of the church. Were they husband and wife under the act of 1872 (*Gen. Stat.*, § 2030)? In other words, did they, in the terms of the statute, occupy the relation of husband and wife, and were they cohabiting as such and recognizing that relation as still existing at the time of the passage of the act? Now this question is not to be determined by what the neighbors and community considered them; but did Roanoke and Delia undertake and agree to occupy the relation to each other of husband and

wife, and were they cohabiting as such? He says she did. She says she did not. I am disposed to think this is not the marriage contemplated by the act of 1872. Certainly Roanoke, by his own act, corroborates his wife. He did not consider Delia his wife, for he not only said he never married her, but has actually married another woman by the rites of the church. I must, therefore, conclude that these persons are properly described in the words of the act as "persons who have agreed to live in concubinage after their emancipation."

But the learned and ingenious counsel, Mr. Dozier, does not claim that Roanoke is entitled to his homestead because he is the husband of Delia, but that being the father of Cupid, who lives with him, he is the head of a family. And this brings up the question: Can a man claim this beneficent provision of the constitution by virtue of the violation of the moral law and the proprieties of society? If Roanoke and Delia were not husband and wife, Cupid is a bastard—the son of no one. He cannot inherit Roanoke's estate, and it is hard to conceive, in a Christian country, that vice and immorality will be encouraged by a constitutional provision, that a debtor shall escape the payment of an honest debt by interposing his bastard son! It is true I was referred to a case from one of the Western States, where a woman was awarded her homestead, she having a bastard child, and, therefore, the head of a family. I will not set the example of introducing such a school of morals in this old State of South Carolina. Men shall not be rewarded for violating social duty and decency by my consent.

The defense was forcibly and well argued by Mr. Sessions. The plaintiff set up no claim for homestead either before, at the time, or after the sale, until the filing of the complaint in January, 1883, the sale being made in July, 1882, under an execution lodged in November, 1881. He became the tenant of the defendant, and is now on the land as his tenant. He refers to *Agnew* v. *Adams, Oliver* v. *White,* by the present court, and *Manning* v. *Dove,* by the old court, 10 *Rich.* 395, to show that the plaintiff is estopped. From the views above expressed, it is not necessary to lengthen out this judgment. The complaint is dismissed with costs.

Plaintiff appealed upon the following grounds:

1. Because, it is submitted, his Honor misinterpreted the evidence, the clear weight of which showed that Roanoke and Delia were husband and wife, under the terms of the act of 1872.

2. Because, whether they were husband and wife or not, it is admitted that Cupid was their son, that he was recognized as such by Roanoke, and, in fact, has lived with and been supported by Roanoke since his early infancy, and this being the case, the plaintiff was, at the time of the levy and sale, the head of a family, and, therefore, entitled to a homestead under the constitution and laws of this State.

*Mr. R. Dozier*, for appellant.

*Mr. Joseph Sessions*, contra.

March 10th, 1884. The opinion of the court was delivered by

MR. CHIEF JUSTICE SIMPSON. The action below was an action on the equity side of the court, for the recovery and assignment of a homestead in certain lands located in Georgetown county. The lands in question formerly belonged to the appellant, but were sold in 1882 by the sheriff of Georgetown under an execution against the appellant in favor of respondent, who became the purchaser. No claim was made of the homestead at the sale. It is admitted, however, that the debt of appellant to the respondent under which the sale was made was contracted since the constitution of 1868. Since the sale appellant has been a tenant of respondent. The answer denied, first, that appellant was a married man, or the head of a family; and, second, the fact that appellant suffered the land to be sold to respondent without objection, or claim of homestead, was also interposed as a defense by way of estoppel. The Circuit judge dismissed the complaint on these two grounds set out in the answer.

While we must affirm the judgment below, yet we do not concur on the grounds upon which it was based. We think that the act of 1865, 13 *Stat.* 269, as construed in *Davenport* v.

*Caldwell,* 10 *S. C.* 335, and *State* v. *Whaley, Id.* 500, is the act under which the facts here should have been considered, instead of the act of 1872, upon which it seems that the Circuit judge relied. It appears that the appellant and Delia were married before emancipation " according to plantation law." They went to their master and had a house assigned them, and they were thus living together as man and wife a short time as slaves, when the act of 1865 was passed. They had several children. True, they have been living apart for the last ten years, but their condition at the passage of the act of 1865, was as above described, which made their children legitimate, one of whom, the youngest, Cupid, is still living with the appellant, his father. This constitutes him the head of a family. *Garaty & Armstrong* v. *Dubose,* 5 *S. C.* 499.

Nor do we think that the conduct of the appellant in not forbidding the sale by the sheriff estops him from still claiming his homestead, if he is otherwise entitled thereto. Section 1994, general statutes, while declaring that a homestead shall be exempt, further provides, that it shall be the duty of the sheriff before selling, to have it set off, and if the debtor neglects to nominate an appraiser, the sheriff shall appoint. And in section 1998 is found the following: " No waiver, however solemn, shall defeat the right." Here, the appellant was in possession when the land was sold, he was simply silent, and remained in possession until he was ejected by a trial justice. The purchaser was his creditor, and has not been injured. This is no place for the doctrine of estoppel. *Bull* v. *Rowe,* 13 *S. C.* 370 ; *Douglass* v. *Craig,* 13 *S. C.* 375.

The judgment, however, must be affirmed on a different ground from those above. The right of homestead is a statutory right, or rather a constitutional right, to be enforced by statutory proceedings. Under the statutes upon the subject of homestead, the Circuit Court is without original jurisdiction therein. Such jurisdiction has not been conferred upon this court either on its law or equity side. The act of force in reference to homesteads prescribes the mode of obtaining it in clear and distinct terms, and provides the necessary machinery to that end, suited to all cases where the right has attached,

whether it be in a debtor himself, with mesne or final process impending or otherwise, or whether it be in his widow and children. Where a right is provided by statute, to be enforced in a prescribed mode, no other can be resorted to. The mode prescribed is exclusive. *Ex Parte Lewie*, 17 *S. C.* 156 ; *Howze* v. *Howze*, 2 *S. C.* 222.

It is the judgment of this court that the judgment of the Circuit Court be affirmed without prejudice, however, to appellant, in any subsequent proceeding he may institute, if so advised, to obtain a homestead.

MR. JUSTICE McIVER concurred generally, but MR. JUSTICE McGOWAN only in the result.